Filed 7/24/14  P. v. Hidalgo CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B252911 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA092535) |
| v. | |
| ERIC HIDALGO et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of the County of Los Angeles, Mark C. Kim, Judge.  Affirmed.

David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant Eric Hidalgo.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant Francisco Gomez.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Jonathan J. Kline and Esther P. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

**INTRODUCTION**

Defendants and appellants Eric Hidalgo (Hidalgo) and Francisco Gomez (Gomez) (collectively defendants) were convicted of two counts of forcible oral copulation while acting in concert (Pen. Code, § 288a, subd. (d)(1)[1]), one count of forcible rape while acting in concert (§ 264.1, subd. (a)(1)), and one count of forcible sodomy while acting in concert (§ 286, subd. (d)(1)). On appeal, defendants contend that the trial court erred in failing to instruct the jury with CALJIC No. 10.65, and Hidalgo further contends that he was denied effective assistance of counsel when his trial counsel conceded that a jury instruction under CALJIC No. 10.65 should not be given. We affirm the judgments.

**BACKGROUND**

### A.    Factual Background

#### 1.    *Prosecution Evidence*

In May 2012, Sandra M. (Sandra) worked at Mi Morenita, a restaurant and bar located in the City of Carson (the bar). She worked there as a waitress and a "fichera," a person who was paid to drink beer with the patrons of the bar. As a "fichera," she would dance with patrons if they invited her to dance.

According to Sandra, Gomez was a regular customer of the bar, and Hidalgo was an infrequent customer. Sandra had known Gomez for about five years, and Hidalgo for about nine years. Sandra considered both men to be her friends.

On or about May 5, 2012, Sandra was working at the bar. At about 10:00 p.m., Gomez and Sandra began drinking beer at the bar and they continued drinking until the early morning hours of May 6, 2012. At some point, Hidalgo was at the bar.

---

[1]    All statutory citations are to the Penal Code unless otherwise noted.

Gomez "was hardly talking" to Sandra, and instead was talking with his friends. She did not flirt with Gomez, rub her buttocks against him, show her breasts to Gomez, or fall when she attempted to stand up from her bar stool. Gomez did not attempt to lift her up from the floor, or move between her legs while she was sitting on a bar stool. Sandra did not dance with anyone that night, nor did she sing or play pool with the patrons.

After the bar closed at 2:00 a.m. on May 6, 2012, Sandra remained in the bar and continued drinking with Gomez and Hidalgo. She denied going to her car with Gomez to sleep. Sandra testified that she consumed about 10 to 12 beers at the bar, "and after that, [she did not] remember anything else" that happened that night at the bar. She may have been drunk.

At about 7:00 a.m., Sandra left the bar and went to her car with Gomez to drive home. She was not sure if she or Gomez drove her car. Sandra did not understand why Gomez was with her because she would usually call her brother to drive her when she became really drunk. When Sandra arrived at her apartment, she saw her brother outside, and he asked her why she had come home when she had called him and asked him to pick her up at the bar. She, her brother, and Gomez then went inside her apartment. She did not know why she invited Gomez to go inside her apartment. She did not want Gomez to be with her and did not want to continue drinking with him. Gomez gave Sandra's brother money to buy more beer. Sandra did not recall her brother returning to the apartment with beer. She did not keep beer at her home, but recalls consuming beer there that morning.

According to Sandra, from 6:00 a.m. through 10:00 a.m., she did not have sex with Gomez. She was not attracted to him.

At some point Sandra saw Hidalgo inside her apartment, but did not recall how or when he entered. She, Gomez, and Hidalgo were talking and drinking while sitting at the dining room table. No one else, including Sandra's brother, was in her apartment.

Sandra observed Gomez take "out some drugs," make "lines" with it on the table, and saw both defendants consume the drugs. Sandra did not willingly ingest the drugs.

3

Hidalgo told her that she should also consume the drugs, and Sandra told him that she was afraid to "do drugs." She had "never had anything to do with drugs." "[T]he next thing" Sandra remembered was that defendants "had [her] naked" and she was "fighting" with them. She would not have undressed willingly. Sandra was "pulled" by both defendants.

Sandra was face down on the bed in the living room, and Hidalgo "grabbed" her head and said he wanted her to orally copulate him. Sandra refused, stating, "No, you're my friend." Hidalgo put his penis in her mouth. Sandra pulled away, but Hidalgo grabbed her "hard." Gomez also grabbed Sandra from behind and put his penis in her anus. Sandra testified that she "fought them so they wouldn't do anything to [her]," and "struggled a lot with them." Gomez also put his penis in her vagina.

Later, Sandra's three children and brother arrived at the apartment, and one of the defendants, who was naked, ran to the bathroom. Sandra had on clothes when the children and her brother entered the apartment.[2] Sandra was afraid to tell her brother that she had been sexually abused by defendants because she thought defendants might do "something worse" to her.

Sandra saw Gomez give money to Anibal to buy food. Defendants left the apartment immediately after Anibal returned to the home.[3]

At about 1:30 a.m. on Monday, May 7, 2012, Hidalgo returned to Sandra's home. Sandra told him to leave, and then told Anibal that the men had abused her. Hidalgo never went inside the apartment and left about 30 minutes after he arrived as Sandra's home.

Later in morning of Monday, May 7, 2012, at Sandra's request, Maria Del Carmen Leon (Carmen) went to Sandra's home. Sandra told Carmen about the assault, and

---

[2]     Anibal M. (Anibal), Sandra's oldest son, testified that after he entered the apartment, he saw "really big" bruises on Sandra's leg.

[3]     Anibal testified that after defendants left the apartment, Sandra was "acting weird," and was shaking and scared.

4

showed Carmen the bruises on her arms and legs.[4]  Sandra was not bruised when she came home from the bar with Gomez.

After Sandra told Carmen about the assault, she also told her boyfriend about the incident.  Sandra reported the incident to police after her son and boyfriend told her that they would contact the police if she did not.

Sandra testified that about a week after defendants were taken into custody, she spoke with Estelita Castillo.  Sandra said that she did not tell Castillo, as reported by Castillo, that "these assholes didn't give me money, not even for a doctor or anything."

City of Los Angeles Police Officer Annissa Harsma assisted in the rape investigation.  On May 7, 2012, at about 9:30 p.m., she spoke with Sandra.  Sandra was upset throughout the entire interview.  Sandra told Officer Harsma that defendants took turns forcing her to orally copulate them.  She explained that one of the defendants held her head down on the bed while the other defendant forced his penis into her mouth.  Sandra also said that defendants also took turns forcibly having vaginal and anal sex with her; one of the defendants held her by the arms and legs while the other defendant forced his penis into her vagina and anus.  Sandra also told Officer Harsma that defendants forced her to lick methamphetamine off the dining room table.

On or about May 8, 2007, Susan Barie, a registered nurse and member of a sexual assault response team, conducted a sexual assault examination of Sandra.  Prior to the examination, Sandra was upset, confused, and was not sure why the incident had happened to her.  Sandra told Barie that she had been drinking beer on the night of the assault, and remembered having about 15 beers within 12 hours of the assault.  Sandra said that defendants coerced her —by badgering her—into taking methamphetamine and drinking more alcohol, and believed this contributed to her memory loss.  During the examination, Sandra stated that she had back pain, and vaginal and stomach soreness.  Sandra also stated that during the assault, defendants grabbed her legs, arms and

---

[4]     Carmen testified that Sandra had bruises on her arms and "all over her body."
Carmen said that Sandra told her defendants forced Sandra to have sex with them, and
that Sandra was bleeding from her anus.

5

shoulders, and held her down. Both defendants penetrated her vagina twice, digitally penetrated her vagina numerous times, and forced her to orally copulate them. Sandra did not recall if defendants penetrated her anus. Sandra told Barie that during the incident, no weapons were used, and there were no physical blows, physical restraints by use of an object, strangulation, or threats of harm.

Barie's physical examination of Sandra revealed multiple bruises on Sandra's body, including to her lower jaw, back, shoulders, arms, inner thighs, and legs. A vaginal examination revealed abrasions inside Sandra's vagina and abrasions on her external genitalia. An anal examination revealed that Sandra suffered multiple tears and abrasions with bleeding. Based on the examination, Barie concluded that Sandra's injuries were consistent with sexual assault.


2. *Defendants' Evidence*

Ingrid Barahona was the owner of the bar. Barahona had known both defendants for several years as customers of her bar. Barahona did not use "ficheras," and Sandra was not an employee of the bar. Sandra would frequent the bar with different people.

According to Barahona, the night prior to the incident, Sandra and Gomez were drinking together. At one point, Sandra wanted to dance for Gomez. She started to climb onto one of the bar stools, fell backwards, and landed on her back on the tile floor. Hidalgo "grabbed" Sandra by her arms and picked her up. Sandra was flirtatious with Gomez at the bar. Sandra was "really close" to Gomez, had her arms around him, and at one point, exposed her breast to him and allowed him to touch it. When Barahona was closing the bar at 2:00 a.m., she saw Sandra "do drugs." Sandra had a "line" of "white powder" on the bar, and she was getting close to it with a rolled-up bill in her nose. Barahona told Sandra to stop consuming the drugs.

Barahona did not allow customers to remain in the bar after closing time. She called a taxi for Hidalgo and saw him leave the bar. When Barahona left the bar for the evening, Sandra and Gomez were sitting in Sandra's car, smoking cigarettes.

6

Marie Estelita Castillo, Barahona's mother-in-law, formerly owned the bar. She has known Sandra and defendants for several years. When Castillo owned the bar, Hidalgo was an occasional customer, and Gomez would go to the bar "almost every day." She considered defendants to be her friends. In May 2012, Castillo called Sandra and asked her why she had reported defendants to the police. Sandra responded that defendants "were real assholes. They didn't pay me for my time and they didn't pay for a doctor for me."

Catarino Pulido was an employee of the bar. He knew defendants through his employment, and was friends with them. Sandra did not work at the bar. On May 5, 2012, at 10:00 p.m., Pulido arrived at the bar. At that time, defendants were there separately, and Sandra was there drinking by herself. Later, Pulido saw Sandra drinking with Gomez. Sandra was "being really playful" with Gomez. She was acting "very sexual with him." Sandra had her arms around Gomez, kissed him on the cheeks, and "[got] right up next to him." At one point, Sandra exposed her breast to Gomez and "grabbed" his head and pulled it toward her. Sandra sat on Gomez's lap, and was between his legs with her back to him. Sandra danced "very sexually" for Gomez. At 1:30 a.m., Sandra fell backwards off a bar stool after trying to climb on top of it. Hidalgo helped her up. At 2:00 a.m., Pulido and Barahona closed the bar and Pulido locked the door. At about that time, Hidalgo left in a taxi, and Sandra and Gomez stayed outside in the parking lot smoking cigarettes.

### 3. Rebuttal

City of Los Angeles Police Detective Brian Gasparian testified that he spoke to Barahona on June 12, 2012, the day after Hidalgo was arrested. Barahona did not tell Detective Gasparian that on the night before the assault, Sandra fell while at the bar, or that she saw Sandra ingest any kind of narcotics there.

7

## B. Procedural Background

Following trial, the jury found defendants guilty of two counts of forcible oral copulation while acting in concert (§ 288a, subd. (d)(1)) (counts 1 and 2), one count of forcible rape while acting in concert (§ 264.1, subd. (a)) (count 3), and one count of forcible sodomy while acting in concert (§ 286, subd. (d)(1)) (count 5). The trial court sentenced each defendant to state prison for a term of 36 years, awarded them custody credit, and ordered them to pay various fees, fines and penalties. Defendants filed timely notices of appeal.

## DISCUSSION

### A. CALJIC NO. 10.65

Defendants contend that the trial court erred in not instructing the jury on defendants' reasonable belief as to Sandra's consent pursuant to CALJIC No. 10.65, commonly known as a "Mayberry instruction."[5] We disagree.

#### 1. Applicable Law

CALJIC No. 10.65 states, "In the crime of unlawful [forcible rape] [oral copulation by force and threats] [forcible sodomy] [penetration of the [genital] [or] [anal] opening by a foreign object, substance, instrument or device by force, [violence] [fear] [or] [threats to retaliate]], criminal intent must exist at the time of the commission of the (crime charged). [¶] There is no criminal intent if the defendant had a reasonable and good faith belief that the other person voluntarily consented to engage in [sexual intercourse] [oral copulation] [sodomy] [or] [penetration of the [genital] [anal] opening by a foreign object, substance, instrument, or device]. Therefore, a reasonable and good faith belief that there was voluntary consent is a defense to such a charge[.] [, unless the defendant thereafter became aware or reasonably should have been aware that the other person no longer consented to the sexual activity.] [¶] [However, a belief that is based

---

[5] *People v. Mayberry* (1975) 15 Cal.3d 143.

upon ambiguous conduct by an alleged victim that is the product of conduct by the defendant that amounts to force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person of the alleged victim or another is not a reasonable good faith belief.] [¶] If after a consideration of all of the evidence you have a reasonable doubt that the defendant had criminal intent at the time of the accused sexual activity, you must find [him] [her] not guilty of the crime."

The Supreme Court stated in *People v. Martinez* (2010) 47 Cal.4th 911 that "CALJIC No. 10.65 is based upon our decision in *People v. Mayberry* (1975) 15 Cal.3d 143 [125 Cal.Rptr. 745, 542 P.2d 1337], which held that a defendant's reasonable and good faith mistake of fact regarding a person's consent to sexual intercourse is a defense to rape because it negates the wrongful intent required for the crime. [Citation.]" (*Id*. at pp. 953-954.) "The *Mayberry*[6] defense has two components, one subjective, and one objective. The subjective component asks whether the defendant honestly and in good faith, albeit mistakenly, believed that the victim consented to sexual intercourse.[7] In order to satisfy this component, a defendant must adduce evidence of the victim's equivocal[8] conduct on the basis of which he erroneously believed there was consent. [¶] In addition, the defendant must satisfy the objective component, which asks whether the defendant's mistake regarding consent was reasonable under the circumstances. Thus, regardless of how strongly a defendant may subjectively believe a person has consented

---

6     We also refer to the *Mayberry* defense or instruction.

**7**     "Consent for purposes of rape prosecutions is defined as 'positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved.' [Citation.]" (*People v. Williams* (1992) 4 Cal.4th 354, 361, fn. 6.)

**8**     "'Equivocal' is defined as follows: "'1. that can have more than one interpretation; having two or more meanings; purposely vague, misleading, or ambiguous [an *equivocal* reply] 2. uncertain; undecided; doubtful [an *equivocal* outcome] 3. suspicious; questionable [*equivocal* conduct].""" (*People v. Burnham* (1986) 176 Cal.App.3d 1134, 1146, fn. 14.)

to sexual intercourse, that belief must be formed under circumstances society will tolerate as reasonable in order for the defendant to have adduced substantial evidence giving rise to a *Mayberry* instruction. [Citations.]" (*People v. Williams*, *supra*, 4 Cal.4th at pp. 360-361.)

"[B]ecause the *Mayberry* instruction is premised on mistake of fact, the instruction should not be given absent substantial evidence of equivocal conduct that would have led a defendant to reasonably and in good faith believe consent existed where it did not." [Citation.]" (*People v. Martinez*, *supra*, 47 Cal.4th at p. 954.) A trial court must give a requested instruction only when the evidence is sufficient to "deserve consideration by the jury," not "whenever any evidence is presented, no matter how weak." (*People v. Williams*, *supra*, 4 Cal.4th at p. 361.) The trial court, however, "must give the *Mayberry* instruction . . . despite the alleged temporal context in which that equivocal conduct occurred." (*Id*. at p. 364.)

Typically, "[a] trial court has a duty to instruct the jury 'sua sponte on general principles which are closely and openly connected with the facts before the court.' [Citation.]" (*People v. Abilez* (2007) 41 Cal.4th 472, 517.) "In the absence of a request for a particular instruction, a trial court's obligation to instruct [sua sponte] on a particular defense arises '"only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case."' [Citations.]" (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1148; *People v. Maury* (2003) 30 Cal.4th 342, 424.)

### 2.     *Background*

During a discussion of the jury instructions between counsel and the trial court, Hidalgo's counsel conceded that there was no evidence to support the conclusion that Sandra consented to engage in the sexual conduct that occurred at her house. Later, the following exchange occurred: "[Trial court:] Now . . . tell me if there are any [jury instructions] you want me to give that I have not included in the packet. [¶] . . . [¶] [Hidalgo's counsel:] 10.65. It is—belief as to consent, forcibly—forcible rape—

10

[¶] [Trial court:] 10.65. . . . How is this applicable? [¶] . . . [¶] [Hidalgo's counsel:] That in this case the defendants may have had a reasonable belief that the victim—as the victim reported to the nurse, there were no threats, there was no violence, no weapon, no weapons, no nothing. And the report— [¶] [Trial court:] So let me ask you this question. When we went over earlier instructions, I asked you what evidence is there that indicates there was consent. You said there is none. [¶] [Gomez's counsel:] I mean at the house. [¶] [Trial court:] That's what we are talking about. Acts happened at the house, not at the bar. [¶] [Hidalgo's counsel:] Your Honor, . . . if—the jury does not believe the victim's testimony– [¶] [Trial court:] Let's say we take out the victim's testimony about resisting, testimony she didn't want this to happen. Let's take that out. What other evidence is there that there was consent? [¶] [Gomez's counsel:] None. [¶] [Hidalgo's counsel:] Circumstantial evidence. [¶] [Trial court:] [Gomez's counsel] says none, you say circumstantial. What circumstantial— [¶] [Hidalgo's counsel:] Circumstantial. Whether conduct at the bar was conducive to— [¶] [Trial court:] You talked about foreplay and all that other stuff. So you are saying that if something happened at a bar as described, that is consent? [¶] [Gomez's counsel:] Yes. [¶] [Trial court:] So you changed your mind, [Gomez's counsel]? [¶] [Gomez's counsel:] No. I mean, if at the house it's—that there is not the actual consent, but prior to getting to the consent there is—I think you can argue that there is active participation of Sandra with the defendant, the acting in a sexual way. [¶] [Prosecutor:] Your Honor, may—I be heard? [¶] [Trial court:] Yes. [¶] [Prosecutor:] There is no evidence that anything sexual occurred that would lead anyone to believe consent outside that bar. In fact, the evidence that we have from the defense witnesses outside that bar is that all she did was smoke and talk to [Gomez]. [¶] We don't have—there is no evidence in this case from anyone that she ever did anything sexual toward [Hidalgo]. There is no evidence she took out her breast to [Hidalgo], ground up on his pelvis. [¶] [Trial court:] There is evidence to that. [¶] [Prosecutor:] On [Gomez], not [Hidalgo]. So . . . [Hidalgo] can't even argue for consent at the home, because [Hidalgo] goes home in a taxi. There is nothing sexual she does to him from all the evidence—suddenly he shows

11

up at her apartment— [¶] [Trial court:] That's true. [¶] [Hidalgo's counsel:] No, Your Honor, the victim testified she didn't remember if she called [Hidalgo]. [¶] [Trial court:] Calling or not calling is irrelevant. [¶] [Hidalgo's counsel:] Inviting him to join to drink at six in the morning or seven— [¶] [Trial court:] So if a woman or man visits somebody at 6:00 in the morning, that's an invitation or consent to have sex? That's your argument? [¶] [Gomez's counsel:] Coupled with a lot of other things. [¶] [Trial court:] I am not talking about Gomez, talking about Hidalgo right now. [¶] [Hidalgo's counsel:] Hidalgo was at the restaurant and—was with them at the restaurant. [¶] [Trial court:] Meaning 'with them' means consent? [¶] [Hidalgo's counsel:] No, not—yet—

[¶] [Trial court:] Let me hear it. [¶] [Hidalgo's counsel:] No, Your Honor, conduct towards [Gomez] may lead to a reasonable belief that the victim consented. If the victim called [Hidalgo]— [¶] [Trial court:] There was no evidence that she called him. [¶] [Hidalgo's counsel:] I asked whether if she called— [¶] [Trial court:] She said she didn't recall. [¶] [Hidalgo's counsel:] She said I don't remember. [¶] [Trial court:] She doesn't remember anything. [¶] [Hidalgo's counsel:] So it's a possibility that she could have called him. [¶] [Trial court:] [Hidalgo's counsel], anything is possible. That's called speculation. You need something. You need evidence to indicate that there was consent. [¶] . . . [¶] [Prosecutor:] Your Honor, if [Gomez's counsel] is going to come forward requesting that for . . . Gomez, then I do have argument against that. [¶] [Trial court:] At this point, [Gomez's counsel] already indicated that there was no evidence at the location of the house that there was issue of consent. . . . [T]his only is applicable when there is a good faith argument about false belief, mistake about consent. There is no such evidence here. So that's why I am inviting both parties to tell me if there is such evidence to show that there was a mistaken belief of consent that—there was evidence of that. I will give you one more chance to argue first thing tomorrow morning. You can study tonight and let me know tomorrow morning."

The next day, the following exchange occurred: "[Trial court:] [The] other issue was 10.65, which was implied consent that defense requested. I've indicated that my preliminarily ruling was that there was no . . . evidence to support it. [¶] If you look at

the use notes, it should only be given when there's a claim of mistake of fact as to consent. I indicated whether or not any evidence you would like to state, why the court should give the instruction, you were saying no. [¶] [Hidalgo's counsel:] I am saying that I did not find any person that supports my position that I indicated yesterday that there was evidence of implied consent by the victim's conduct prior to getting to her home. [¶] [Trial court:] I think, [Gomez's counsel], you also said you conceded this point. [¶] [Gomez's counsel:] Right. [¶] [Trial court:] So that will not be given."

### 3. Analysis

#### a) Hidalgo

The objective component of the *Mayberry* defense concerns whether the defendant's mistake regarding consent based upon the victim's equivocal conduct was reasonable under the circumstances. (*People v. Martinez*, *supra*, 47 Cal.4th at p. 954; *People v. Williams*, *supra*, 4 Cal.4th at p. 361.) Hidalgo concedes that there was no evidence that Sandra acted in a sexual manner toward him as she allegedly had toward Gomez at the bar, discussed below, but argues that "[n]evertheless, [Hidalgo] was present during these claimed activities and certainly could have gotten the impression that Sandra was at the very least flirting with Gomez and possibly looking to become involved in sexual activity." Hidalgo further argues that there is no evidence that after he arrived at Sandra's home that Sandra requested that he and Gomez leave. Hidalgo essentially contends that he could reasonably believe Sandra consented to have sex with him because he was present at the bar when Sandra acted promiscuously toward Gomez and there is no evidence that Sandra requested Hidalgo or Gomez to leave her home.

We disagree with Hidalgo. There is not substantial evidence that Sandra's equivocal conduct would have led Hidalgo "to reasonably and in good faith believe consent existed where it did not." (*People v. Martinez*, *supra*, 47 Cal.4th at p. 954.) In addition, there is no evidence satisfying the subjective component of the *Mayberry* defense—that Hidalgo in fact believed Sandra consented to engage in sexual intercourse

13

with him.  The trial court therefore did not err in not instructing the jury pursuant to CALJIC No. 10.65 on behalf of Hidalgo, whether in response to Hidalgo's request or sua sponte.

                b)        Gomez

Gomez contends that, "There was ample circumstantial evidence of Sandra's 'equivocal conduct' towards [him] in the hours before the incident.  Multiple witnesses testified that Sandra had been flirting with [him] throughout the night, including that she was rubbing against him suggestively; dancing 'for him;' showing him her breast and pulling his head towards her exposed breast; sitting on his lap; spending time with him outside the [bar] and in her car after the bar closed; and, finally, taking [Gomez] home with her in her car."  If the jury believed Gomez's evidence of Sandra's equivocal conduct, and rejected Sandra's testimony of the events, there is substantial evidence that Sandra's equivocal conduct would have led Gomez to reasonably and in good faith believe, albeit mistakenly, that Sandra consented to the sexual encounter.  There, however, is no evidence that Gomez in fact believed Sandra consented—the subjective element.  The trial court therefore did not err in not instructing the jury on Gomez's reasonable belief as to Sandra's consent pursuant to CALJIC No. 10.65.

                c)        Harmless Error

Even if the trial court erred in not instructing the jury on CALJIC No. 10.65, the error was harmless under either *Chapman v. California* (1967) 386 U.S. 18, 22, 24 (*Chapman*) [harmless beyond a reasonable doubt], or *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) [reasonable probability of more favorable result].  CALJIC No. 10.65 provides that a reasonable and good faith belief that there was voluntary consent is a defense to the charged crime "unless the defendant thereafter became aware or reasonably should have been aware that the other person no longer consented to the sexual activity."

Even if defendants had a reasonable and good faith belief that Sandra consented to have sex with them, defendants reasonably should have been aware that Sandra no longer consented to the sexual activity. Sandra was the only witness who testified regarding the sexual encounter. Sandra stated that she resisted Hidalgo's attempts to force her to orally copulate him, stating, "No, you're my friend." When Hidalgo forced his penis in Sandra's mouth, she pulled away. In response, Hidalgo grabbed her "hard" and Gomez grabbed her from behind and put his penis in her anus. Sandra testified that she "fought them so they wouldn't do anything to [her]," and she "struggled a lot with them." Sandra told Officer Harsma that defendants took turns forcing her to orally copulate them and forcibly having vaginal and anal sex with her. Sandra explained to Officer Harsma that one of the defendants held her head down on the bed while the other defendant forced his penis into her mouth, and one of the defendants held her by the arms and legs while the other defendant forced his penis into her vagina and anus. If the trial court erred, the error was harmless on the facts of this case.

### B. Ineffective Assistance of Counsel

Hidalgo contends that if the trial court was not required to instruct the jury, sua sponte, with CALJIC No. 10.65, he was denied effective assistance of counsel when his trial counsel "conceded that CALJIC [No.] 10.65 should not be given." We disagree.

"To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687-694; *Williams v. Taylor* (2000) 529 U.S. 362, 391-394; *People v. Kraft* (2000) 23 Cal.4th 978, 1068.) "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Cunningham, supra*, 25

15

Cal.4th at p. 1003.)  "When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for the counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation."  (*People v. Anderson* (2001) 25 Cal.4th 543, 569.)

Here, the record does not show the reason Hidalgo's counsel conceded that CALJIC No. 10.65 should not be given.  Hidalgo contends there could be no satisfactory reason for his counsel's concession.  As discussed above, the trial court did not err in not instructing the jury pursuant to CALJIC No. 10.65.  Even if the trial court erred, the error was harmless.  Therefore, the performance of his trial counsel was not deficient. Hidalgo's claim of ineffective assistance of counsel fails.

## DISPOSITION

The judgments are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

MOSK, J.

We concur:

TURNER, P. J.

KRIEGLER, J.

16